GALEN MEDICAL ASSOCIATES, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

CRAssociates, Inc., Defendant–Intervenor.

No. 05–755 C.

United States Court of Federal Claims.

Originally Filed Under Seal Oct. 30, 2006.

Nov. 20, 2006.

Terry Wallace, Ridgeland, MS, for plaintiff.

Claudia Burke, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Todd M. Hughes, Assistant Director for defendant.

Devon Hewitt and John E. Jensen, McLean, VA, for defendant-intervenor.

1. Confidential material has been blackened out at the request of the parties, to permit the filing of this copy in the public record.

2. Administrative dissolution is involuntary. BLACK'S LAW DICTIONARY 506–07 (8th ed.2004). In-

## REDACTED OPINION and ORDER[1]

MEROW, Senior Judge.

Plaintiff protests the award of an outpatient clinic contract by the Department of Veterans Affairs ("VA"). On July 19, 2004, the G.V. (Sonny) Montgomery VA Medical Center in Jackson, Mississippi issued a fifty-five-page solicitation for the provision of an outpatient clinic in Meridian, Mississippi for an estimated veteran population of over 3,200. The solicitation was for one year (October 1, 2004 through September 30, 2005) with options for three additional years. (AR 1–55.) The solicitation was amended on August 3, 2004 and again on August 11, 2004. (AR 56–62.) On August 17 and August 19, 2004, bids were received from Galen Medical Associates, Inc., d/b/a Patient First Urgent Care Clinic, Inc. (("Galen") (AR 63–274); Henderson Meyer Dannemiller, LLC (AR 275–392); and CRAssociates, Inc. ("CRA") (AR 393–766).)

On August 27, 2004, the VA determined that Galen and CRA were within the competitive range. Following either clarifications or discussions (or both), discussed *infra*, both Galen and CRA were notified they could submit final proposal revisions by noon on September 14, 2004. (AR 858, 931.) On September 13, 2004, CRA submitted its final proposal revision ("FPR"). (AR 851–52.) Also on September 13, 2004, Galen submitted its FPR, stating that "[a]fter a thorough review of the Technical Proposal, Galen will not make any revisions (other than the requested clarification)" discussed *infra*. (AR 922 (parenthetical in original).) Galen's FPR also included a reduced price and several completed pages that were not included in its initial proposal. The contract was awarded to CRA on January 18, 2005.

About three weeks prior to the January 18, 2005 contract award, on December 28, 2004, Galen, a Mississippi corporation, was involuntarily administratively dissolved under Mississippi Code Section 79–4–14.21[2] for failure

voluntary dissolution differs from voluntary dissolution in that it is not commenced by a board of directors and approved by shareholders; rather, it is imposed as a result of an administrative deficiency (such as failure to file an annual re-

to file its annual reports or failure to pay franchise taxes. *Miss. Sec'y of State Bus. Servs., http://secure.sos.state.ms.us/Busserv/ corp/soskb/Filings.asp?2 55651* (last visited October 11, 2006) [hereinafter *"Galen's dissolution history "*]. Galen's dissolution history indicates the corporation had been involuntarily administratively dissolved and subsequently reinstated on several previous occasions.[3]

By Order dated April 25, 2006, the court requested briefing on the issue of Galen's standing to bring this suit and ability to acquire the subject contract. Before filing its supplemental brief on May 22, 2006, on May 3, 2006, Galen obtained reinstatement under Mississippi Code Section 79–4–14.22.[4] Galen admits a lapse in corporate status, but relies upon Mississippi's corporate revivor statute to correct that defect retroactive to July 15, 2005 when this post-award bid protest litigation was commenced, and to January 15, 2005 when the contract at issue was awarded. Defendant and intervenor disagree, asserting that Galen neither had the capacity to contract at the time of the award, nor the standing to sue at the time this suit was filed. Pending are cross-motions for judgment on the administrative record.

### Discussion

■ Standing to sue is a threshold requirement in every federal action. *Sicom Sys. Ltd. v. Agilent Tech.*, 427 F.3d 971, 975 (Fed.Cir.2005). Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed.Cir.2002); *see also Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed.Cir.2005).

■ The court may raise standing issues *sua sponte* before proceeding to substantive matters. *See John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1353 (Fed.Cir. 2006) ("Under federal rules any court at any stage in the proceedings may address jurisdictional issues. Thus, even if the issue is not properly raised, this court *sua sponte* may consider all bases for the trial court's jurisdiction."). *See Folden v. United States*, 379 F.3d 1344, 1354 (Fed.Cir.2004); *see also Fieldturf, Inc. v. Sw. Recreational Indus., Inc.*, 357 F.3d 1266, 1268 (Fed.Cir.2004); *Pacetti v. United States*, 50 Fed.Cl. 239, 243–44 (2001). "Federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' " *Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.*, 361 F.Supp.2d 1244, 1259 (E.D.Wash.2004) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). Standing may be examined at any stage of litigation. *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed.Cir.2003) ("It is well-established that any party, and even the court sua sponte, can raise the issue of standing for the first time at any stage of the litigation, including on appeal."). *See Kaw Nation v. Norton*, 405 F.3d 1317, 1323 (Fed. Cir.2005) ("[W]e may address jurisdictional issues in any order."); *Castle v. United States*, 301 F.3d 1328, 1337 (Fed.Cir.2002). It is prudent to resolve standing issues in the early stages of litigation to avoid what might be unnecessary efforts by the parties and the court. *Computer Prods. Int'l, Inc. v. United States*, 26 Cl.Ct. 518, 522–23 (1992).

■ In this regard, the Tucker Act extends to this court "jurisdiction to render

---

port or pay franchise taxes), a judicial decision, or involuntary bankruptcy. *Id.*

3. The court further notes that Galen's proposal for the VA contract was in Galen's name d/b/a Patient First Urgent Care Clinic, P.A. (AR 63, 64.) The last annual report filed by Patient First was on November 4, 2003. A Notice to Dissolve/Revoke was issued by the Mississippi Secretary of State on November 4, 2003 and October 20, 2004. That corporation was administratively dissolved on December 28, 2004. https:**secure.

sos.state.ms.us/busserv/corp/soskb/Filings.asp? 256556 (last visited October 17, 2006).

4. The Mississippi reinstatement statute is almost identical to the Revised Model Business Corporation Act ("RMBCA"). The only difference is that Mississippi allows five years for reinstatement after dissolution as opposed to two years in the Model Act. Model Bus. Corp. Act §§ 14.21, 14.22 (reprinted in 1 Fletcher Cyclopedia of the Law of Corporations § 2.25 (rev.vol.1999)).

judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2000). *See Rex Serv. Corp. v. United States,* 448 F.3d 1305–07 (Fed.Cir.2006); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003). Although § 1491(b)(1) does not define the term "interested party," the United States Court of Appeals for the Federal Circuit has adopted the definition from the Competition in Contracting Act ("the CICA"), 31 U.S.C. § 3551(2)(A). *Rex Serv. Corp.,* 448 F.3d at 1307 ("the term 'interested party' in section 1491(b)(1) is construed in accordance with the ... [CICA] .... As such [interested parties] ... are limited to 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' ") (citations and emphases omitted). For its "direct economic interest" to be affected, the protestor must show that it was prejudiced. *See Info. Tech. & Applications Corp.,* 316 F.3d at 1319; *Myers Investigative & Sec. Servs., Inc.,* 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). To establish prejudice, a protestor must demonstrate "there was a 'substantial chance it would have received the contract award but for [the error alleged].' " *Galen Med. Assoc., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed.Cir.2004) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir. 1996)).

■ There is no indication in the record before the court that the Contracting Officer ("CO") responsible for the contract at issue was aware of, or considered, Galen's lapsed corporate status. However, determinations as to standing, which require consideration of prejudice, are not confined to the reasoning expressed by the agency in resolving the merits of the protest controversy. *See OMV Medical Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir.2000). Standing is a threshold issue which should be resolved by the court before proceeding to the merits. *Myers Investigative & Sec. Servs.,* 275 F.3d at 1369.

Galen argues that it has standing to press this bid protest because an administratively dissolved corporation can litigate, pointing to Section 79–4–14.05(b) of the Mississippi statute which allows a voluntarily dissolved corporation to commence or continue litigation.

(b) Dissolution of a corporation does not:

...

(5) Prevent commencement of a proceeding by or against the corporation in its corporate name;

(6) Abate or suspend a proceeding pending by or against the corporation on the effective date of dissolution;

...

(Pl's.Supp.Br.3.) That provision, however, is inapposite. There are two types of corporate dissolution under Mississippi law—voluntary dissolution (termination of the corporation by volition of the officers or board of directors) (Miss.Code Ann. § 79–4–14.01–14.09) and involuntary or administrative dissolution (termination by the Secretary of State) (Miss. Code Ann. § 79–4–14.20–14.21). Section 79–4–14.05(b), cited by Galen, is in Subarticle A titled "Voluntary Dissolution."

Subarticle B, "Administrative Dissolution," is not so lenient. An administratively dissolved corporation "continues its corporate existence but may not carry on **any business except that necessary to wind up and liquidate its business and affairs under § 79–4–14.05 ....**" Miss.Code Ann. § 79–4–14.21(c) (emphases added). Section 79–4–14.05 gives examples of permitted corporate acts of liquidation and winding up, including the collection of assets, disposal of properties and discharge of liabilities:

(a) A dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs; including:

(1) Collecting its assets;

(2) Disposing of its properties that will not be distributed in kind to its shareholders;

(3) Discharging or making provisions for discharging its liabilities;

(4) Distributing its remaining property among its shareholders according to their interest; and

(5) Doing every other act necessary to wind up and liquidate its business and affairs.

Immediately following this subsection is only one additional provision, "[t]he administrative dissolution of a corporation does not terminate the authority of its registered agent." § 79–4–14.21(d). In comparison, the enumerated retained powers of a voluntarily dissolved corporation in Subarticle A, Section 79–4–14.05(b)(1)–(7) are broader and include the ability to commence litigation cited by Galen as well as the continued authority of the corporate registered agent.[5] That only the continued authority of the registered agent is included in Subarticle B governing involuntary dissolution dictates the narrow scope of this subsection. Neither initiation of a bid protest over a contract award made during the time of that dissolution, nor the grant of a new contract, is winding up or liquidating, within the activity limits of an administratively dissolved corporation.[6] Accordingly, Galen lacked standing to litigate and lacked the ability to contract. As such, it cannot show the prejudice required to qualify as an interested party with respect to pro-

testing the award of the contract at issue to CRA.

■ Galen, however, cites curative provisions in Mississippi law. By satisfying administrative and tax deficiencies, an administratively dissolved corporation may be reinstated and "resumes carrying on its business as if the administrative dissolution never occurred." Miss.Code Ann. § 79–4–14.22(c). As a result, "actions taken [by the corporation] during the period of ministerial dissolution are those of the corporation, since the dissolution, through the thaumaturgic power of the law, never took place." 3 ENCYCLOPEDIA OF MISSISSIPPI LAW, § 22.244 (Sept.2006 update). Retroactive reinstatement, "revivor," a legal fiction, legitimizes many (but not all) actions taken by dissolved corporations *nunc pro tunc*.[7] Galen was reinstated on May 3, 2006. *See* Galen's dissolution history. Galen's assertion that reinstatement cured any infirmities in its standing at the time this lawsuit was filed and/or at the time the contract was awarded is incorrect.

In *Bryant Construction Co., Inc. v. Cook Construction Co., Inc.*, 518 So.2d 625 (1988), the Mississippi Supreme Court explained that upon involuntary administrative dissolution, the corporation lost the capacity to initiate litigation.[8]

**5.** Section 79–4–14.05(b) provides:

(1) Transfer title to the corporation's property;
(2) Prevent transfer of its shares of securities, although the authorization to dissolve may provide for closing the corporation's share transfer records;
(3) Subject its directors and officers to standards of conduct different from those prescribed in Article 8;
(4) *Change quorum or voting requirements for* its board of directors or shareholders; change provisions for selection, resignation or removal of its directors or officers or both; or change provisions for amending its bylaws;
(5) Prevent commencement of a proceeding by or against the corporation in its corporate name;
(6) Abate or suspend a proceeding pending by or against the corporation on the effective date of dissolution; or
(7) Terminate the authority of the registered agent of a corporation.

**6.** Galen does not contend that this litigation is to collect a corporate *res* for purposes of liquidation or winding up.

**7.** The incentive of retroactive reinstatement is consistent with the purpose of dissolution statutes as a means of raising revenue for the state. *See Kerney v. Cobb*, 658 S.W.2d 128, 131 (Tenn. Ct.App.1983) (noting that the sole purpose of an analogous Tennessee corporate dissolution statute is to raise state revenue as evidenced by the retroactive effect of reinstatement); *Allied Roofing Indus., Inc. v. Venegas*, 862 So.2d 6, 9 (Fla. Dist.Ct.App.2003) ("The sanctions authorized for ... involuntary dissolution ... are intended to benefit the State, not third parties outside the State/corporation relationship."); *see also Loveday v. Cate*, 854 S.W.2d 877, 880 (Tenn.Ct.App. 1992) ("It is also important to note that the sole purpose of ... the statute authorizing revocation and reinstatement of a corporate charter, is to raise revenue for the state.").

**8.** The plaintiff in *Bryant* was suspended under Mississippi Code Section 27–13–27, a corporate dissolution and reinstatement statute that is very similar to Section 79–4–14.22. One difference between the two statutes is that Section 27–13–27 required that suspension be set aside within twelve months of suspension in order for a corporation to be restored as if "said suspension

When the corporation is suspended, it loses all rights "acquired by the form of the organization," [Miss.Code Ann.] § 27–13–27, one of which, no doubt, is the right to sue in the corporate name. **Thus, during its suspension, Bryant had no right to bring suit in the corporate name.** Therefore, the trial court was probably correct in dismissing the original complaint, which was filed during the period of the suspension.

. . .

The effect of Bryant's suspension was that the corporation was a nullity insofar as the courts' [sic] of this state recognizing it as an entity that could sue.

518 So.2d at 631 (emphases added.) "[A]ny action taken by a suspended corporation during the time of the suspension is beyond the powers of the corporation, i.e., ultra vires." 518 So.2d at 629 (emphasis in original). *See also PLM v. E. Randle Co.,* 797 F.2d 204, 206 (5th Cir.1986) (applying Mississippi law and holding that a corporation could not maintain a breach of contract action filed while its corporate rights were suspended for failure to file an annual report); *Carolina Transformer Co., Inc. v. Anderson,* 341 So.2d 1327, 1329 (Miss.1977) (finding a suspended corporation was "functionally unable to operate" and had no power to act as a corporation, but not addressing retroactivity); *United States v. 2.61 Acres of Land,* 791 F.2d 666, 668 (9th Cir.1985) (delinquent corporation could not bring suit under California law); *Dawn Const. Co. v. Paris Home Builders, Inc.,* 360 Mich. 281, 103 N.W.2d 410, 411–13 (1960) (corporation prohibited from filing contract action during period of suspension); *State ex rel. Dept. of Highways v. Martin,* 572 P.2d 611, 614 (Okla.Civ.App.1977) (same). *Cf. Capital Associates, Inc. v. Sally Southland, Inc.,* 529 So.2d 640, 641–42, 644 (Miss.1988) (no error in refusing to dismiss when foreign corporation's qualification to do business in the state lapsed subsequent to contracting and after filing suit).

In *Bryant,* because the corporation was subsequently reinstated, the original standing defect was cured with an amended complaint. *Id.* at 631. Here, Galen has neither requested, nor filed, an amended complaint, but as noted *infra,* any such filing would not alter the conclusion that it lacks standing.

In *Computer Products International, Inc. v. United States,* 26 Cl.Ct. 518, 524 (1992), the court applied California law that stripped the capacity of an administratively dissolved corporation from initiating or defending litigation. While the corporation was eventually reinstated (after the issue of corporate status was raised by defendant on the eve of trial), by that time the twelve-month statute of limitations of the Contract Disputes Act, 41 U.S.C. § 609(a)(3), had run. Holding reinstatement was not retroactive, the court granted defendant's motion to dismiss. The reasoning of *Computer Products* applies with equal force here. Reinstatement does not relate back to and cure Galen's lack of capacity to file the Complaint.

Galen admits as much. "The Court [in *Bryant*] treated the original complaint as properly dismissed.... The Court found that the original complaint was filed prior to reinstatement and was properly dismissed, whereas the amended complaint was filed after reinstatement, which restored Bryant's power to sue and was wrongfully dismissed." (Pl.'s Supp. Br. 4.) Accordingly, because Galen was an involuntarily administratively and dissolved corporation under Mississippi law at the time the Complaint was filed, Galen did not have the capacity to commence this litigation and dismissal is warranted.

In *Paradise Creations, Inc. v. UV Sales, Inc.,* 315 F.3d 1304, 1308 (2003), the Federal Circuit determined whether a dissolved corporate plaintiff that was reinstated after filing a patent infringement action could retroactively create constitutional standing and federal jurisdiction when the corporation was: (1) dissolved at the time of the purported assignment of the patent; and (2) dissolved at the time it filed the action. The Federal Circuit examined the corporation's standing under Article III of the United States Constitution.[9] Constitutional standing

had not been imposed." The current statutory cure period is five years. Section 79–4–14.22(a).

9. Although this court was established under Article I, 28 U.S.C. § 171, standing requirements are the same as for Article III courts. *Anderson v.*

is determined as of the date the litigation was commenced. *Id.* at 1307–08 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 570 n. 5, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In *Paradise Creations,* the plaintiff obtained rights in a patent through an assignment agreement entered into during the period of its corporate dissolution. The Federal Circuit's focus was on the status of the acquiring entity at the time of the initiation of the litigation—did the plaintiff have an enforceable right to the patent at that time? If not, no state survival statutes could cure that defect. "[T]he corporate revival statute ... [could not] retroactively confer standing in federal court." 315 F.3d at 1309. Article III standing has three elements: (1) " 'injury in fact'—an invasion of a legally protected interest;" (2) "a causal connection between the injury and the conduct complained of;" and (3) likelihood that the injury would be redressable by a favorable decision. *Id.* (citing *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130). On the date the Complaint was filed, plaintiff was an administratively dissolved corporation that could not have acquired the patent. "[T]he appellant in this case had no enforceable rights whatsoever in the patent at the time it filed suit." 315 F.3d at 1310. The *Paradise Creations* court noted in dicta that the appellant would probably have the capacity to sue in the Florida courts either as an administratively dissolved corporation "wind[ing] up and liquidat[ing] its business and affairs" or as a retroactively reinstated corporation. *Id.* at 1307, 1309. However, because the dissolved corporation lacked Article III standing under federal law in that it could not have acquired the patent, it was unnecessary to determine the state law issues. *Id.* at 1309–10.

The situation caused by Galen's administrative dissolution is similar to that set forth in *Paradise Creations, Inc.* At the time of the contract award on January 18, 2005, Galen was administratively dissolved. Any retroactive effect of Galen's reinstatement on May 3, 2006, cannot extend to undoing the January 18, 2005 contract award to CRA. No *ultra vires* actions are involved as Galen did not contract. Galen was not in a status

where it could contract on January 18, 2005, to provide the services sought by the VA. If it could not contract, it was not then an "interested party" eligible to protest the award to another. Galen cannot show that it was prejudiced by the award of the contract to CRA. Thus, Galen lacks standing to litigate over the award to CRA and the Complaint must be dismissed.

However, even were it assumed that Galen had standing to litigate this post-award protest, it is concluded that the CO's decision to award the contract to CRA was neither arbitrary, capricious nor contrary to law.

Agency decisions are reviewed according to the standards set forth in the Administrative Procedures Act ("APA"). *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' ") (quoting 5 U.S.C. § 706(2)(A)). *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001). *De minimus* errors in the procurement process, however, do not warrant relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996).

Plaintiff bears the burden of establishing the award was arbitrary or capricious. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988)). That burden is a heavy one, as courts recognize that contracting officers are " 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1332–33 (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* (citations and internal quotation marks omitted.) The more discretion

*United States,* 344 F.3d 1343, 1349–50 (Fed.Cir.  2003).

afforded the contracting officer, the higher the burden on the protester. *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980) (citing *Keco Indus., Inc. v. U.S.,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1204 (1974)). In negotiated procurements, such as the one now before this court, contracting officers have even more "breath of discretion," which imposes a heavier burden on a plaintiff. *Id.* at 598 (citing *Keco Indus., Inc.,* 492 F.2d at 1204). Similarly, a contracting officer has more discretion in "best value" procurements than awards based on price alone. *Galen Med. Assoc., Inc.,* 369 F.3d at 1330 (citing *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996)).

" 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996).

### Facts

On July 19, 2004, the VA issued solicitation No. 586–09–05 to provide Community Based Outpatient Clinic Services ("CBOC") for the G.V. (Sonny) Montgomery VA Medical Center in Meridian, Mississippi. (Pl.'s Statement of Facts ("SOF") ¶ 1; Def.'s Resp. ¶ 1; Intervenor's Resp. ¶ 1.) The solicitation permitted the VA to award the contract with or without discussions. (AR 41.) The award would be based on best value—the most advantageous to the government considering price and other factors. (AR 46.) Proposals would be evaluated on technical capability, past performance and price. (*Id.*) Technical capability and past performance combined were given equal weight as price, however, technical capability was to be given more weight than past performance. (*Id.*) By August 17, 2006, three bids were submitted. The VA classified Galen's and CRA's bids within the competitive range. (AR 782–819.)

Galen claims that, in connection with the initial submitted proposals, the CO should have rejected CRA's bid as nonresponsive because it failed to include: (1) on-site laboratory and radiological services; and (2) a lease of the proposed facility. Both were material requirements of the solicitation. Galen contends it was prejudiced, because if CRA's bid would have been rejected as nonresponsive, Galen would have been the only bidder and presumably would have been awarded the contract.

■ The CO was not arbitrary or capricious in not rejecting CRA's initial proposal and seeking clarifications discussed *infra.* As for the omitted laboratory and x-ray services, the solicitation stated that proposals "**should** include on-site laboratory and radiological services, as well as access to first fill, emergent pharmaceutical prescriptions." [10] (AR 6 (emphasis added).) In a fifty-three-page solicitation and 302–page proposal, the CO did not abuse her discretion or act arbitrarily or capriciously in seeking clarification in this regard and/or in not rejecting CRA's initial proposal. (AR 1–55, 464–766.) Indeed, in her initial evaluation, CRA had points deducted from its technical score. In this negotiated procurement, the VA had the obligation to obtain the best value for the government and, to that end, had the discretion to conduct discussions to bring nonconforming offers into the competition. (AR 41 ("[T]he Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may . . . waive informalities and minor irregularities in offers received.").) *See* 48 C.F.R. § 52.215–1(f)(4). In a negotiated procurement, if a proposal does not comply with the solicitation, " 'an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal.' " *EP Prods., Inc. v. United States,* 63 Fed.Cl. 220, 225 (2005) (quoting *ManTech Telecomm. & Info. Systems v. United States,* 49 Fed.Cl. 57, 71 (2001), *aff'd,* 30 Fed.Appx. 995 (2002)).

■ Galen did not establish that CRA's initial proposal imposed modifications that

---

**10.** Generally, "should" is a request or directory suggestion vice the use of a mandatory "shall."

*Hopi Tribe v. United States,* 55 Fed.Cl. 81, 89 (2002).

would characterize its proposal as nonresponsive or outside the competitive range, or result in an advantage in the competitive bidding process. CRA's initial proposal called for routine laboratory services to be drawn at the Clinic and then taken to the VA Medical Center in Jackson, Mississippi for processing, while urgent laboratory services would be transported to the Riley Hospital in Meridian. (AR 393; 840 ("Initially ... CRA sought to have all laboratory testing completed at the VAMC in order to ensure application of similar standards throughout the VAMC health care system ... [h]owever, in order to ensure our full compliance with the specifications [in its subsequent clarification] ... CRA is modifying our proposal.").) Indeed, it appears that VA laboratory testing services are used in other facilities. (AR 888.) Deductions from CRA's technical scoring accommodated this omission. If any technical deviation would render a proposal nonresponsive, much of the technical scoring would be meaningless.

As for a lease, the solicitation required the street address of the facility proposed and demonstrated access to public transportation, highways and parking. (AR 44.) The facility proposed had to be within the city limits of Meridian, Mississippi—which significantly narrowed the choice of possible locations. (*Id.*) Galen included a contingent lease agreement with Riley Hospital of Meridian, Mississippi in its initial proposal.[11] (AR 184–202.) CRA's proposal asserted it was the only possible offeror who could comply with the twenty-one-day startup requirement which could only be met using the existing clinic location at 2103 13th Street, Meridian, Mississippi, and it had a "signed agreement transferring the lease of the facility to CRA and a lease agreement with Riley Hospital for the term of the Contract." (AR 462.) "CRA has negotiated an exclusive lease for this facility, contingent upon contract award." (AR 468.) Neither an assignment nor a lease was, however, included in CRA's original proposal. There is no allegation CRA did not have a right to use and has been using the clinic site, and the administrative record

contains evidence of a lease and assignment of interest. That CRA later provided a copy of a contingent lease does not indicate that such formal documentation was required under the VA solicitation or that Galen was treated arbitrarily or capriciously.

Galen suggests that the VA acted arbitrarily and capriciously because in a prior solicitation Galen was penalized for not having or providing a signed lease for a facility, while in this solicitation CRA was not. In *Galen Medical Associates, Inc. v. United States,* 369 F.3d 1324 (Fed.Cir.2004), the Federal Circuit affirmed the defendant's and intervenor's motions for judgment on the administrative record. *Galen Medical Assocs., Inc. v. United States,* 56 Fed.Cl. 104 (2003). There, Galen's proposal included both a primary and an alternate clinic location. The primary location was the existing clinic facility which was then under lease to Dr. Downing, the incumbent. *Id.* The contract was awarded to Dr. Downing. Prior to filing its bid protest in this court, GAO dismissed Galen's protest for lack of standing, concluding its technical proposal was nonresponsive. *Id.* The Court of Federal Claims disagreed with the GAO's conclusion, noting that the CO (like the CO did in the case *sub judice*) did not reject Galen's bid as nonresponsive, but "reduced [Galen's] scores for lack of a viable site." *Id.* at 108. After a thorough review of the administrative record and Galen's numerous allegations, the Court of Federal Claims concluded that the VA award was not arbitrary or capricious, nor an abuse of discretion, and the VA had sufficient grounds to conclude Dr. Downing's proposal offered the best value to the government. *Id.* at 111. Rather than disparate treatment, there was consistency—neither Galen's proposal in the prior solicitation, nor CRA's proposal here, was rejected as nonresponsive.

Affirming, the Federal Circuit noted the GAO's dismissal of Galen's protest for lack of standing was because its proposal was nonresponsive. *Galen Medical,* 369 F.3d at 1328 n. 1 ("Galen's primary site was occupied by

---

11. The contingent lease provided is between Riley Hospital and Dr. Perry Wallace. (AR 184, 199.)

Downing and Galen would not have been able to use it unless Downing gave up the lease. Galen's secondary site was much smaller than the VA facility used at the time of the solicitation."). The Federal Circuit affirmed the trial court's dismissal on the merits, concluding the VA did not act arbitrarily or capriciously or in excess of its jurisdiction.

Moreover, as noted earlier, the solicitation here only required the location of the proposed facility. (AR 44.) Galen's Reply in this case avers that the facility requirements for both solicitations were the same. (Pl.'s Reply Br. 6.) While Galen correctly cites Article 10 ("Contractor's Physical Facility") is part of both solicitations, that section provides only that the facility meet certain fire and ADA (Americans with Disabilities Act) standards within twenty-one days and have enough parking. (See AR 16 and Pl.'s Reply to Intervenor's Resp. to Pl.'s Mot. for Sum J. ["Pl.'s Reply"] App. B. 24.)

In offering as its primary site the clinic then occupied by Dr. Downing, Galen's proposal in the prior solicitation stated that " 'it is our understanding that the leasing of the building is controlled exclusively by the VA contract.' " (Pl.'s Reply, App. C 11–12 (citing to the administrative record in that case).) And, "Dr. Downing's lease did **not** provide in any way that the lessee would be forced to vacate if the lessee did not retain the CBOC contract. For this reason, as GAO determined, Galen simply [did] not possess standing. . . ." (Id.) Accordingly, the proposals in the two solicitations in this regard were different. In the prior solicitation, Galen erroneously thought the lease of the premises tendered as its primary site was determined by the contract award. Galen did not, and could not, provide a lease, and its alternative site was inadequate. Here, both CRA and Galen had contingent leases of the same facility.

Three VA evaluators reviewed and scored CRA and Galen's initial proposals for capability and past performance and those scores were averaged. (AR 780–91, 792–804, 1021.)

### Initial Evaluators' Technical & Past Performance Scores
GALEN MEDICAL ASSOCIATES, INC.

| Evaluators | Technical (80 max) | Performance (20 max) | Total |
|---|---|---|---|
| Dr. Harbour | [Redacted] | [Redacted] | [Redacted] |
| T. Culberson | [Redacted] | [Redacted] | [Redacted] |
| C. Tindall | [Redacted] | [Redacted] | [Redacted] |
| Average Score | | | [Redacted] |

CRASSOCIATES, INC.

| Evaluators | Technical (80 max) | Past Performance (20 max) | Total |
|---|---|---|---|
| Dr. Harbour | [Redacted] | [Redacted] | [Redacted] |
| T. Culberson | [Redacted] | [Redacted] | [Redacted] |
| C. Tindall | [Redacted] | [Redacted] | [Redacted] |
| Average Score | | | [Redacted] |

Neither Galen nor CRA received maximum points for past performance. The solicitation provided that "offerors with no relevant performance history will not be evaluated favorably or unfavorably on past performance." (AR 45); see also 41 U.S.C. § 405(j) Points were deducted from Galen's past performance assessment because four out of five of its required references could either not be contacted or were unuseable (the response being that Galen was a lessee only). (AR 782, 787 ("deducted 10 points due to the inability to talk to any of the references"), 791.) CRA also received deductions for past performance. (AR 795, 799 ("1 [reference] only completed"), 803.) Galen complains that the VA could have found, or was aware of, correct numbers and could have contacted its references. Nevertheless, the CO did not act arbitrarily here. The final point spread was such that even if Galen had gotten the maximum number of points for past performance, CRA would still have had more points.

As for the third and most heavily weighted portion of the evaluations, cost, Galen's initial proposal was [Redacted]; CRA's was [Redacted]. The CO calculated each offeror's total score using the following formula: *Average Technical/Performance Score + Cost Score = Total Score.* (AR 224, 409, 792, 779, 1021–22.) The initial proposal scores were calculated on August 27, 2004 and are expressed in the chart below:

### Initial Cost Proposal Scores

| | GALEN | CRA |
|---|---|---|

| | | |
|---|---|---|
| Initial Price | [Redacted] | [Redacted] |
| Cost Score | [Redacted] | [Redacted] |
| Average Technical/ Performance Score | [Redacted] | [Redacted] |
| Total Score | [Redacted] | [Redacted] |

Although the CO initially gave CRA a cost score of [Redacted], she subtracted 25 points for failure to on-site include laboratory and radiology services. (AR 792.) At this point, Galen had the higher score and asserts inquiry should have ended at this point and the contract awarded to Galen.

However, the CO sought clarifications. To Galen, the CO wrote on September 8, 2004, requesting clarification that Galen could commence performance within twenty-one calendar days from the date the contract was awarded as required in the solicitation.

> Page 3, of your technical proposal, Item A, under duties, your proposal states initial transition phase and 90–day start-up period and on Page 9, Item II, A. Point of Entry (1st 90 days). Please clarify that you intend to meet the requirements as stated in the solicitation on page 13, Item 7, Contract Startup Requirements with in [sic] twenty-one (21) calendar days after contract award.

(AR 917.) Clarification by noon on September 9, 2004, was requested. (*Id.*)

On September 9th, Galen faxed its response. "Upon contract award, Galen shall comply and intends to meet the requirements as stated in the solicitation on page 13, Item 7, Contract Startup Requirements with in [sic] twenty-one calendar days after contract award." (AR 916.)

On September 7, 2004, the CO wrote to CRA, also asking for clarification: "[y]our technical and cost proposal deviate from the solicitation requirements for laboratory and X-ray [sic] services. Please verify that you intend for these services not to be included." (AR 850.) Response by noon on September 9, 2004, was requested. (AR 850.) On September 8, 2004, CRA responded, adding that the clarification request prompted a reevaluation of its "entire proposal and pricing structure." (AR 840.) To "ensure our full compliance with the specifications contained within the RFP, CRA is modifying our proposal to include the provision of laboratory services ordered by our primary care providers and both the technical and professional component of radiology services ordered by our primary care providers." (*Id.*) Previously planned facility modernization resulted in reductions and the addition of laboratory and radiology services added cost, however, overall, the proposal price was [Redacted]. (AR 409, 792, 843.) In sum, CRA included laboratory and radiological services, deleted certain planned modernization, and [Redacted].

The CO then recalculated the cost scores after receiving these clarifications.

### Post–Clarification Scores

| | GALEN | CRA |
|---|---|---|
| Post–Clarification Price | [Redacted] | [Redacted] |
| Post–Clarification Cost Score | [Redacted] | [Redacted] |
| Average Technical/ Performance Score | [Redacted] | [Redacted] |
| Total Post–Clarification Score | [Redacted] | [Redacted] |

(AR 779, 792, 1021.)

The CO's calculation of Galen's score was incorrect in two respects. First, Galen's initial cost score increased from [Redacted] to [Redacted], even though Galen did not change its price. Secondly, the Total Post–Clarification Score was miscalculated: [Redacted]. While it is apparent Galen's cost score should have remained at [Redacted], which would then result in the total score of [Redacted] shown ([Redacted]), regardless of error, the CO subsequently offered each an opportunity to submit final proposals and rescored both thereafter.

Galen argues that the CO clearly identified a weakness in CRA's bid—the exclusion of required x-ray and laboratory services and should have rejected CRA's bid as nonresponsive, which would have resulted in Galen being the only bidder. On the other hand, the CO merely requested confirmation that Galen intended to comply with a twenty-one-day startup requirement (AR 917), which had already been addressed in Galen's original proposal. (AR 13 (description of the startup requirements to be completed prior to the commencement of treatment at the hospital but after award of the contract)); (AR 76 ("start-up/transition complete 21 days after

contract award" without detail).) Galen suggests the CO's question to Galen was a ruse request to justify providing CRA an opportunity to conform its bid to the solicitation. The record provides no support for Galen's suggestion. The CO's action was not arbitrary or capricious in this regard. The first two sentences of CRA's proposal dated August 17, 2004, assert CRA is the "only Contractor able to provide continuation of services and to meet the twenty-one (21) day start-up requirement contained in the RFP." (AR 393.) Also, as defendant points out, the twenty-one-day startup period was not a perfunctory administrative matter. Rather, to garner a medical team and equipment to provide the level of services required for over 3,000 potential patients would be no small task. And the solicitation detailed the checklist, all to be done within twenty-one calendar days:

### 7. Contract Startup Requirements

a. The Contractor's startup requirements must be completed prior to the commencement of the contractor's treatment of G.V. (Sonny) Montgomery VA Medical Center, Jackson, MS, enrolled patients. The contractor shall comply with the following contract requirements **twenty-one (21)** calendar days after contract award:

(1) The contractor will hire, train, and ensure licensureship of all necessary personnel.

(2) The contractor will have completed all necessary subcontracting with others providing services under this Plan.

(3) The contractor shall furnish evidence of insurability of the offeror and/or of all healthcare providers who will perform under this contract.

(4) All contractor-provided health care services shall be available:

   1. Preventive Health Services.

   2. Primary Care Services.

   3. Physician Services.

(5) The contractor's case management program with primary care providers as case managers for all health care services provided to enrolled patients will be operational.

(6) The contractor's quality assurance program shall have been approved by the G.V. (Sonny) Montgomery VA Medical Center, Jackson, MS and be operational.

(AR. 13–14 (parenthetical omitted).) The CO was neither arbitrary nor capricious nor did she abuse her discretion in seeking clarification from Galen on this matter. Both bidders were allowed to clarify.

Furthermore, as noted above, Galen's initial proposal could have been determined to be nonresponsive for failure to adequately address the twenty-one-day startup period and to complete required certifications in the proposal, a deficiency later identified by the VA as discussed *infra.* On the record, there was no abuse of discretion by the CO. *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").

■■■ Discussions, unlike clarifications, must be extended to all bidders "to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1561 (Fed.Cir.1996). The Federal Circuit addressed the meaning of clarifications and discussions in *Information Technology & Applications Corp. v. United States,* 316 F.3d 1312, 1320–21 (Fed.Cir.2003). "[U]nlike clarifications, discussions 'are undertaken with the intent of allowing the offeror to revise its proposal.'" *Id.* at 1321 (citing 48 C.F.R. § 15.306(d) (2002)). The definition of clarifications has been expanded to permit greater exchanges between the government and bidders, however, bid revisions still fit squarely into the classification of discussions. *Id.* (*comparing* 48 C.F.R. § 15.601 (1991), *with* 48 C.F.R. § 15.306(a)(2) (2002)).

Here the CO used the term "clarification" in corresponding with both Galen and CRA regarding their bids. Later, the VA wrote in a letter dated February 28, 2005: "The contracting officer held discussions with the two remaining competitors whereby she asked for remediation of deficiencies in their proposals." (AR 1016.) The letter noted the CO mistakenly referred to them as "clarifications." (*Id.*) The court is "mindful to examine critically any *post hoc* rationalizations for ... agency action." *OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 118 n. 14 (2005) (citations omitted). The nature of the CO's request suggests that she anticipated and invited clarifications to the two proposals (CRA— the laboratory and radiology services and Galen—the twenty-one-day startup requirement and later the completion of several pages of the proposal). Given the apparent intent of the CO and the VA's later characterization of the requests as discussions, no abuse of discretion has been shown, nor were the CO's decisions to allow responses to these clarifications arbitrary or capricious. The court finds that the CO was not arbitrary or capricious in her dealings with the bidders.[12]

On September 13, 2004, both CRA and Galen were allowed to make "final proposal revisions by 12 noon on September 14, 2004. Final proposal revisions shall be in writing and the Government intends to make award without obtaining further reviews." (AR 858, 931.) The CO's letter to Galen also noted Galen's proposal was incomplete; it was missing several representations and certifications: "Also, please complete Clause 52.212-3 Offeror Representations and Certifications— Commercial Items (MAY 2004) the following items are incomplete (c)(2); (c)(5); (c)(19)(I)(ii), (d)(I)(ii); (d)(2)(ii); please complete and provide revised pages with your proposal." (AR 931.) Despite failure to sub-

mit a complete package, the CO did not reject Galen's proposal.

Galen's final proposal dated September 13, 2004, reduced its price from [Redacted] to[Redacted] and, as requested, completed the Representations and Certification section of the solicitation—pages 47 through 50 of the original solicitation. (AR 925–28.)

CRA's final proposal dated September 13, 2004, recited further "pencil sharpening" and a reevaluation "based on full compliance with the requirements of the RFP," and "understanding the fiscal constraints of the Government and the need to contain costs," reduced its price to [Redacted]. (AR 851.)

### Scores After Final Proposal Revisions ("FPR")

|  | GALEN | CRA |
| --- | --- | --- |
| Price Score | [Redacted] | [Redacted] |
| Cost Score | [Redacted] | [Redacted] |
| Average Technical/ Performance Score | [Redacted] | [Redacted] |
| **Total Score** | [Redacted] | [Redacted] |

(AR 779, 792.)

Galen's original cost score of [Redacted] was increased to [Redacted] due to [Redacted]. While CRA's initial technical proposal received deductions for omitting laboratory and radiology services (AR 793–94, 797–98 (two-point deduction in one area and one in another); 801 (three-point deduction)), after CRA submitted those services in its revised proposal, its technical score remained the same. If the technical score had been revisited, CRA's technical/performance score would have increased, but since CRA had the higher score in any event, this slip was of no consequence.

On January 11, 2005, the VA received pre-award business clearance review from the Acquisition Resources Service. (AR 983.) The CO then requested CRA provide evidence of a lease for the proposed facility.[13]

---

**12.** Galen made a similar argument in its previous bid protest, also against the VA. In *Galen Medical Associates, Inc. v. United States,* 369 F.3d 1324, the Federal Circuit did not find evidence of unequal discussions and favoritism in the administrative record.

**13.** The record contains a December 21, 2004, letter from CRA requesting a 120–day extension

of its contingent lease agreement (AR 860), and a lease agreement dated August 20, 2004, and signed on August 25, 2004. (AR 861–85.) Correspondence dated August 9, 2004 from CRA Riley Hospital discusses and encloses an assignment of Dr. Downing's lease. (AR 881.) Accordingly, although the signed lease assignment is dated August 20, 2004—subsequent to CRA's August 17, 2004 proposal, agreement in this re-

(Dec. of CO Brenda Stewart at ¶ 4.) On January 18, 2005, the VA awarded the contract to CRA. (AR 889.) Galen requested a debriefing on January 19, 2005, to which the VA responded on January 25, 2005. (AR 960.) Displeased by the information supplied by the CO and allegedly inequitable disparities in the bidding process (Pl.'s SOF ¶¶ 30–35), Galen filed a protest with the General Accounting Office ("GAO") on January 27, 2005. (AR 979.) However, Galen dismissed its GAO protest on March 14, 2005, and filed this bid protest on July 15, 2005.

▇▇▇ Galen complains that the events and discussions leading up to the requests for final proposals were not equal. Discussions must be held equally with competitive bidders and must be "meaningful." *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir.2000). Under 48 C.F.R. § 15.306(d)(3), the CO must "[a]t a minimum . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." However, the CO "is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment." *Id.* Another offeror's price cannot be revealed without permission. *Id.* at § 15.306(d)(4).

Galen's complaint it was unaware that it could reduce its price is belied by Galen's price reduction from [Redacted] to [Redacted]. (AR 779, 922–24.) The CO was not required to request clarification or discuss difficulties contacting Galen's references. *See Labat–Anderson, Inc. v. United States*, 42 Fed.Cl. 806, 835 (1999) (An agency is not "obligated . . . to address in express detail all inferior or inadequate aspects of a proposal.") (citations omitted).

Galen makes numerous other conclusory allegations of unequal treatment, suggesting,

that VA discussions were not meaningful because Galen was not fully informed of proposal weaknesses and CRA benefitted more from these "discussions" than Galen did, advancing from a one-point deficit to becoming an awardee. That the initial contract period was reduced applied to both CRA and Galen and was neither arbitrary nor capricious; that the CO sent emails to two different CRA addresses and used email for CRA and facsimile transmission for Galen; that more technical points were not deducted from CRA's proposal for lack of detail on the first 90 days of operation; that an incorrect facility address is on one of CRA's lease documents, do not suffice to set this award aside. Galen has not established prejudice from any of the myriad of allegations and innuendos made against the VA here, either singly or in combination. From the foregoing, it appears that the more than one million dollar difference in price was a significant, if not the most significant, factor in this negotiated best value procurement. Galen was well aware of, and took advantage of, opportunity to reduce its price. Discussion with each offeror upon different issues was not disparate treatment. That Galen's best and final offer was higher than CRA's is the result of Galen's business judgment, not unequal treatment or unequal opportunity.

Galen has not shown that there was a substantial chance it would have received the VA contract but for the irregularities alleged in the bidding process.[14] The VA was required to determine which offeror provided the "best value" to the government. Despite some emphasis on technical evaluations and past performance, price composed half of that assessment. Galen's final price of [Redacted] was significantly higher than CRA's at [Redacted]. (AR 895.) Galen complains that the CO should have discussed its past performance deductions, which would have resulted in a higher score. However, even if Galen had a perfect past performance score,

---

gard was reached earlier—at least by August 9, 2004. Regardless, there is no allegation that CRA was unable to step into and utilize the Riley Hospital Clinic site to perform this contract.

**14.** If CRA's proposal had been rejected as nonresponsive for failing to include laboratory and

radiology services, Galen would have been the only competitive bidder and ultimately received the VA contract. However, the CO's judgment in seeking clarification, and thus preserving competition in this regard, was not arbitrary or capricious.

its final score would have been [Redacted],[15] still considerably lower than CRA's final score of [Redacted]. Moreover, the Administrative Record indicates that the disparity in the final scores should have been even greater if all the errors were corrected. CRA's final total should have increased three points to [Redacted] by adding the three points initially deducted by evaluators for failing to include laboratory and radiology services. In sum, it cannot be considered unreasonable, arbitrary or capricious to award a contract to the lower priced offeror when the competing bidders have technical ratings not far apart, but the lower offer is over one million dollars less than the other.

### CONCLUSION

Accordingly, it is **ORDERED**:

(1) That the Complaint in this matter shall be **DISMISSED,** without prejudice, as plaintiff lacks standing;

(2) That were standing found to exist, then Defendant's Cross–Motion for Judgment Upon the Agency Record is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED;**

(3) This Opinion is filed under seal to provide counsel with an opportunity to submit a redacted copy(ies) showing items, if any, considered to comprise proprietary matter that should not be included in the copy made available in the public record;

(4) Counsel shall each promptly, and no later than **November 9, 2006,** submit a copy of this Opinion directly to chambers, identifying any portions proposed not to be made available in the public record, so that this Opinion, or an appropriately Redacted Opinion, can be promptly filed in the public record in this matter;

(5) The Clerk of Court shall enter Judgment in accordance with this Opinion. No costs assessed.

---

**15.** A perfect past performance score would have increased Galen's performance/technical score from [Redacted] to [Redacted]. Thus, combining [Redacted] with Galen's final cost score of [Redacted] yields the hypothetical final score of [Redacted].