**Sam H. LOVEDAY, Jr., Plaintiff–Appellant,**

v.

**Ben L. CATE, Jr., and wife Nancy Lambert Cate, Defendants– Appellees.**

Court of Appeals of Tennessee, Eastern Section.

Nov. 23, 1992.

Permission to Appeal Denied by Supreme Court March 22, 1993.

Chris Ralls, Maryville, for plaintiff-appellant.

Keith McCord, with McCord, Weaver, & Troutman, Knoxville, for defendants-appellees.

## OPINION

SANDERS, Presiding Judge, Eastern Section.

The Plaintiff has appealed from a judgment rescinding the sale of his hardware store and requiring restitution of the funds paid by the purchaser.

The Plaintiff–Appellant, Sam H. Loveday, Jr., and his brother, John Loveday, owned and operated a hardware store in downtown Maryville for some 30 years prior to its sale in 1987 which is the underlying cause of this litigation. Sam and John each owned a 50% interest in the business. They operated as a proprietorship until 1982 when they incorporated the business under the name of Loveday Hardware, Inc. After the incorporation, Sam and John were the sole stockholders in the company and each owned 500 shares of the company's stock. They were the only directors of the company and John was president and Sam was secretary of the company. Sam retired in 1982 and John operated the business on a day-to-day basis. John also had a son, Steve Loveday, who worked in the store.

The building in which the business was conducted was not owned by the company but was rented on a month-to-month basis. Sometime in 1987 the building was put on the market for sale. The Defendant–Appellee, Ben Cate, who had been in the insurance business in Maryville for a number of years, became interested in purchasing the building. Mr. Cate had also known Sam and John Loveday for approximately 25 years. As an outgrowth of his interest in the building, Mr. Cate became interested in buying Sam's 50% interest in the hardware company. Simultaneously with this, Steve and his father agreed John would sell his interest to Steve.

Mr. Cate approached Sam about buying his interest in the company, which resulted in an agreement whereby Sam sold his stock in the corporation to Mr. Cate for $45,000. Of this, Mr. Cate paid Sam $10,-000 in cash and he and his wife, Defendant–Appellee Nancy L. Cate, executed three notes to Sam totalling $35,000, bearing 8% interest, payable in 120 monthly installments of $424.66 each.

John also sold his stock in the company to Steve and the transactions were consummated on June 12, 1987, at which time Sam and John transferred their stock and resigned as officers and directors of the corporation. At the same, time Mr. Cate and Steve elected themselves as the directors of the corporation and Steve was elected president and Mr. Cate was elected secretary-treasurer. Steve was also elected as process agent for the corporation to replace John. Mr. Cate and Steve entered into a mutual stock option agreement and it appears they also agreed Steve would run the hardware business and Mr. Cate would devote his time to his insurance business.

The details of what occurred with reference to how Steve operated the business are not in the record, but the record does show that at the time of the sale Loveday Hardware, Inc., was a thriving, debt-free business and as of January, 1989, the business was broke and Steve had negotiated a sale of it without Mr. Cate's knowledge. The company was out of business by May, 1989.

Mr. Cate made his payments to Sam on his notes until June, 1989, but in May, 1989, Mr. Cate learned the charter of the corporation had been revoked by the secretary of state in 1984 for failure to file the corporation's annual report. Since the corporation was out of business, Mr. Cate thought it was not worthwhile to have the charter reinstated, which he could easily have done. He refused to make any further payments on his notes, and that precipitated this litigation.

The Plaintiff filed suit, asking for judgment for the principal balance owed on the

notes, together with interest and attorney's fees.

The Defendants, for answer, admitted the execution of the notes but, for affirmative defense, asserted there was no consideration for the execution of the notes in that the charter of the corporation had been revoked prior to the execution of the notes. The stock in the corporation was worthless as a result of the revocation of its charter. They alleged that at the time of the purchase of the stock the Plaintiff represented to them the corporation was a viable, going concern and they believed it to be a going concern, but since the charter had been revoked, the stock was worthless and the agreement to purchase the stock was void because of mutual mistake.

The Defendants filed a counterclaim against the Plaintiff. In their counterclaim they made the same allegations as were in their answer concerning the revocation of the charter. They alleged they had been induced to purchase the stock as a result of fraud and misrepresentation. They alleged they had paid the Plaintiff the amount of $21,191.84 prior to learning the charter was revoked, and asked for judgment against the Plaintiff for that amount. They alleged they had been damaged as a result of the revocation of the charter, but failed to allege what the damages were.

Upon the trial of the case, the court found the issues in favor of the Defendants and dismissed the complaint. He also found in their favor on their counterclaim, and rendered judgment against the Plaintiff for $21,191.84. He also ordered the notes cancelled.

The Plaintiff has appealed, saying the court was in error. We agree, and reverse for the reasons hereinafter stated.

There are two vital reasons why the judgment of the trial court in this case cannot stand: (1) The Cross–Plaintiffs suffered no damages as a result of the mutual mistake; and (2) Cross–Defendant Loveday was not restored to the status quo.

■ The proof in the record leaves no doubt that both parties were acting in good faith at the time Mr. Cate purchased Mr. Loveday's stock. Neither party knew or had any reason to suspect that the charter of Loveday Hardware, Inc., had been revoked. It is also clear that such a mutual mistake might be grounds for rescinding a contract; however, "The right to rescind is an extreme one and does not rise from every breach, but depends on the gravity of the breach; and the general rule is that rescission will not be permitted for a slight or casual breach of the contract, but only for such breaches as are so substantial and fundamental as to defeat the object of the parties in making the agreement." 17A C.J.S. Contracts § 422(1), Right to Rescind in General, p. 516.

Mr. Cate first learned the charter had been revoked when he received a letter from the secretary of state in May, 1989, in response to the 1989 corporation annual report which had been sent to the secretary of state. The letter, as pertinent here, states: "The charter/certificate of authority of this corporation has been revoked by the secretary of state for failure to file the corporation annual report. Please complete the attached and return for reinstatement. Any request for reinstatement of a corporate charter/certificate of authority must be accompanied by a $35.00 reinstatement fee. This is in addition to any fees associated with the filing of the annual report(s). The application must be accompanied by a certificate from the commissioner of revenue reciting that the corporation has properly filed all reports and paid all taxes and penalties required by the revenue laws of this state. Please contact the taxpayers services division of the Department of Revenue at (615) 741–2481."

Mr. Loveday did not know the charter had been revoked until Mr. Cate told him after receiving the letter. Although neither Mr. Cate nor Mr. Loveday knew the charter had been revoked, the record shows Mr. Steve Loveday was obviously aware of it as early as February, 1988. On February 11, 1988, as president of the corporation, he signed corporate annual reports for 1984, '85, '86, '87, and '88. They were sent to the secretary of state by the company's attorney, requesting reinstatement of the

corporate charter. The following is a copy of the attorney's letter:

"Secretary of State

Attention: Reinstatement

James K. Polk Building, Suite 500

Nashville, Tennessee 372190–5040

"Re: Loveday Hardware, Inc.

"Dear Sir or Madam:

"Enclosed please find a request for reinstatement signed by the President of Loveday Hardware, Inc. Also included you will find a statement of change of registered agent of Loveday Hardware, Inc. and the annual reports for the corporation for 1984, '85, '86, '87, and '88. Enclosed also you will find a check in the amount of $60.00, including $10.00 for each annual report and $10.00 for the statement of change of registered agent.

"If there is anything further that needs to be done for the reinstatement of this charter, please advise immediately.

"With kindest regards, I remain,

"Very truly yours,

/s/ "Martha Black

"Martha S.L. Black"

The record fails to show what, if anything, occurred after this letter was written.

When Mr. Cate was asked on cross-examination why he did not apply for reinstatement of the charter after learning in May, 1987, it had been revoked, his answer was, "Well, the business was no longer in existence after I found out that it was not a corporation."

■ It is important to note that after the sale of the stock in the hardware store, only Mr. Cate or Steve Loveday had the authority to reinstate the charter. Sam Loveday had no such authority after the sale. "We think the legislature clearly intended that reinstatement would be available *only* through persons authorized to act for the corporation whose charter was revoked." *State ex rel. Shriver v. Tennessee Land & Dev. Co.*, 585 S.W.2d 608, 610 (Tenn.1979). (Emphasis ours.) Only Mr. Cate and Steve Loveday, as the two owners, directors and officers, had the authority to reinstate the charter. Mr. Cate,

therefore, had the power to rectify the "mutual mistake" under which he purchased the stock of the hardware store.

Mr. Cate, understandably, had no motivation to reinstate the charter; the hardware store had already gone out of business due to the unscrupulous business practices of his partner, Steve Loveday. His decision not to reinstate the charter, and thus not rectify the "mutual mistake," left him the possibility of claiming "mutual mistake" and demanding rescission, as has been done in the case at bar.

■ It is also important to note that the sole purpose of § 67–4–917, the statute authorizing revocation and reinstatement of a corporate charter, is to raise revenue for the state. *Kerney v. Cobb*, 658 S.W.2d 128, 131 (Tenn.App.1983). The statute does not stand for the proposition that once a corporation's charter is revoked that corporation no longer exists and therefore any acts by the "corporation" are invalid. This is evident by the fact that reinstatement of the charter validates the corporation's existence and privileges from the date of revocation. *Id.*

■ The record is devoid of any proof that the failure of the hardware store was in any way related to the fact that the charter of the corporation had been revoked. "Not only must the mistake relate to a matter on the basis of which the parties contracted, in order to justify rescission, but the mistake must affect the complainant injuriously." 13 Williston on the Law of Contracts (1970), § 1593, p. 578–79. In the case of *Robinson v. Brooks*, 577 S.W.2d 207 (Tenn.App.1978) the court, in addressing the elements necessary for rescission based on mutual mistake, quoted with approval as follows: "In order to authorize relief for mistake the mistake generally must have been mutual, and it must have been material, and not due to the complainant's negligence; and complainant must show injury." 577 S.W.2d at 209.

Not only does the record fail to show any loss suffered by the Plaintiff due to the mutual mistake of the parties, but it shows nothing has been done to restore Mr. Love-

day to status quo. At the time of the sale of the hardware business to Mr. Cate, the company had an excellent inventory and was debt free. Mr. Loveday described it as follows:

"Q. Mr. Loveday, if you know, sir, can you tell the Court what the condition of the inventory and the general business at Loveday Hardware was at the time you transferred your interest to Mr. Cate?

"A. Sir, I think you could ask anybody in Blount County and they would tell you it was one of the best up-to-date hardwares you would find anywhere because I don't know of hardly anything that you couldn't come in and buy at our hardware. We had a wonderful business. We had the cream of the crop.

"Q. What about the indebtedness of the business, do you know whether there was any indebtedness attached to the business.

"A. No, sir.

\*     \*     \*     \*     \*     \*

"THE WITNESS: We never did owe no money."

It is well settled in this jurisdiction that a contract cannot be rescinded without restoring the "status quo." *Brady v. Oliver*, 125 Tenn. 595, 147 S.W. 1135 (1911); *Hawkins v. Byrn*, 150 Tenn. 1, 261 S.W. 980 (1923); *Jones v. Mosley*, 29 Tenn.App. 559, 198 S.W.2d 652 (1947); *Isaacs v. Boker*, 566 S.W.2d 532 (Tenn.1978); 37 Am.Jur.2d Fraud and Deceit § 335 p. 447; 13 Williston, Law of Contracts § 1594 p. 579.

The issues are found in favor of the Appellant. The judgment of the trial court is reversed and the case is remanded for the entry of a judgment in the amount owed on the notes.

The cost of this appeal is taxed to the Appellees.

LEWIS and McMURRAY, JJ., concur.