# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 18, 2015 Session

## 817 PARTNERSHIP v. JAMES GOINS & CARPENTER, P.C. ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 13C1120     W. Jeffrey Hollingsworth, Judge**

_____

### No. E2014-01521-COA-R3-CV-FILED-SEPTEMBER 24, 2015
_____

In 2009, James Goins & Carpenter, P.C. (JGC) leased office space from 817 Partnership (817). JGC later decided to expand its law practice. It leased additional space in the same building from 817. Thereafter, a bank that had occupied the ground floor of the building moved out. Beginning in February 2011, Stuart F. James, an attorney with JGC, began raising concerns about security in the building. Over the course of the next few months, Mr. James repeatedly emailed 817's representatives about security, the heating and air conditioning system, JGC's financial problems, the need for a rent reduction, and a host of other issues. These emails eventually stopped; but in March 2013, Mr. James responded to a notice from 817 that JGC had missed rent payments. At that point, JGC's security issues resurfaced in a series of emails Mr. James sent from March to May of 2013. Ultimately, Mr. James informed 817 that JGC was dissolving and would be vacating the premises well before its lease expired. As a result, 817 filed a detainer action in general sessions court against JGC and Mr. James (collectively the Defendants). The general sessions court granted 817 a judgment. The Defendants filed a "motion to reconsider," which was denied. The Defendants subsequently appealed. On appeal to the trial court, the Defendants repeatedly failed to respond to 817's discovery requests, precipitating multiple motions by 817 to compel and/or for sanctions. The Defendants filed a pleading alleging constructive eviction and demanding a jury trial. The trial court entered an order denying the jury demand pursuant to Tenn. R. Civ. P. 38.03. The trial court eventually sanctioned the Defendants and awarded 817 attorney's fees and expenses. Finally, the trial court determined that the Defendants had waived the defense of constructive eviction and had breached the lease by failing to make multiple rent payments. The court filed a memorandum opinion and entered a final judgment in favor of 817 for $51,912.18, for unpaid rent, late fees, and interest under the lease. In addition, 817 received $49,815.47 to cover attorney's fees and expenses. The Defendants appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Marvin B. Berke and Jeremy M. Cothern, Chattanooga, Tennessee, for the appellants, James Goins & Carpenter, P.C. and Stuart F. James.

Scott M. Shaw, Chattanooga, Tennessee, for the appellee, 817 Partnership.

**OPINION**

**I.**

817 is the owner of a building located at 817 Broad Street in Chattanooga. On January 9, 2009, 817 entered into a lease agreement with JGC, a Chattanooga law firm that has since been dissolved. Under the terms of the lease, JGC agreed to rent half of the second floor of 817 Broad Street for a period of six years, commencing February 1, 2009. Thereafter, JGC sought to expand its law practice and entered into negotiations with 817 to lease more office space. On January 3, 2011, JGC and 817 signed a first amendment to the lease agreement, wherein JGC agreed to rent the remainder of the second floor. Both the original lease agreement and the first amendment to the lease agreement were personally guaranteed by Mr. James.

When JGC entered into the original lease agreement, FSG Bank (FSG) occupied the entire first floor of 817 Broad Street. On February 25, 2011, however, FSG moved out of the building, subsequently leaving the entire ground floor unoccupied. Neither the original lease agreement nor the first amendment to the lease agreement referenced any requirement that the first floor be occupied.

Prior to FSG leaving 817 Broad Street, JGC was informed by a representative of FSG that the bank's security system would be disabled when it vacated the building. Mr. James then raised concerns, through a series of emails in the days leading up to February 25, 2011, about the security of the building once the bank left. As previously noted, neither the lease agreement nor the first amendment to the lease agreement required 817 to provide security for the building.

Larry Parks, an authorized representative of 817, informed Mr. James that he had contacted a security firm and, in addition, had asked FSG to put him in touch with its security company. Mr. Parks inquired to Mr. James about the areas covered by FSG's security system. In response, Mr. James admitted that FSG's security system only

2

covered the portions of the building occupied by the bank, not the lobby or any other areas of the building. Nevertheless, Mr. James maintained that "[w]ithout someone in the ground floor, there is a security issue we believe."

Over three weeks passed before a representative of JGC, on March 17, 2011, sent another email raising security concerns. This email, however, was sent to Russ Elliott, a broker with Luken Holdings who had represented 817 in connection with the original lease agreement. Mr. Elliott, however, had previously informed JGC in a February 24, 2011 email that he did not have the authority to give an official response on 817's behalf regarding measures taken to address JGC's security concerns. As he had done before, Mr. Elliott forwarded JGC's email to Mr. Parks.

On March 23, 2011, Mr. James emailed Mr. Elliott regarding an incident where the overnight cleaning crew left the building unlocked. Mr. Elliott subsequently forwarded this email to Mr. Parks. On April 7, 2011, Mr. James sent another email to Mr. Elliott, this time mentioning the homeless people in front of the building as a security risk. In addition, Mr. James stated, "I now regret doing the lease as I should have made this issue a precondition to the lease and would not have rented the floor had I know [sic] the bank was closing." Mr. James acknowledged that Mr. Parks was a busy man, but said that he would address the security issue if Mr. Parks did not. Mr. Elliott again forwarded this email to Mr. Parks.

On April 8, 2011, Mr. James sent a lengthy email to both Mr. Elliott and Mr. Parks restating his grievances with 817. Specifically, Mr. James (1) mentioned FSG's decision to leave the building and his belief that 817 should have been on notice that FSG would leave the building months before its lease ran out; (2) stated that there were only two tenants in the building after FSG left and that the fourth floor was empty; (3) alleged that the "two stairwells in the building are accessible for anyone to enter the building;" (4) said that since the bank left "the front doors of the building have been left open by the cleaning company;" (5) noted the changing weather conditions; (6) alleged that "more and more homeless are hanging in front of the building" and that it was only a matter of time before "they will discover they can find someplace to hide in the building [to] spend the night out of the weather;" (7) hypothesized that "someone can break into any office and take whatever they please and leave the building unnoticed when the front door is unlocked during the day;" (8) detailed an unrelated incident at another building "on the corner of eighth and cherry street" where a homeless man would allegedly hide in an office building and steal food and money; and (9) mentioned an unrelated stabbing in front of the downtown library, an unrelated shooting in front of the Tivoli Center, and his belief that panhandling had increased in the area. Ultimately, Mr. James indicated that if

3

he did not get an update about 817's efforts to provide security for the building, he would "take appropriate action and let the landlord know what we plan to do."

Mr. Parks later testified in July 2014 that he agreed to install "an apartment type buzz-in system." Nevertheless, this buzzer system was never installed, as Mr. Parks testified that there "was a problem with the door frame and the way the door hardware worked." Though Mr. Parks stated that those problems could have been "easily rectified," he also mentioned that issues arose with the phone line running to the buzzer system. Despite the fact that the Electric Power Board of Chattanooga was contacted in June 2011, Mr. Parks testified that he was never given any notice that the phone line issue was ever fixed. Thereafter, Mr. Parks stated that he tore his quadriceps muscle, which necessitated emergency surgery in July 2011, and ultimately forgot about the installation of the buzzer system. In addition, Mr. Parks noted that the buzzer system never came up again until the spring of 2013.

On December 5, 2012, Walldorf Property Management (Walldorf), the company which managed the building at 817 Broad Street, sent JGC notice regarding a large outstanding balance on JGC's account. Specifically, Walldorf mentioned missing rent payments from August 2010 and November 2011, as well as the fact that JGC's other rent payments were consistently late. On March 12, 2013, Mr. James sent a lengthy email to Cullon Hooks, a representative of Walldorf. Initially, Mr. James disputed the amount of rent that JGC owed, before addressing a number of other issues. First, he indicated that JGC was "pretty dismayed" when FSG left the building, which he believed had led to the creation of "some serious security issues." Mr. James also alleged that "[p]eople from the streets of Chattanooga enter the building at will" and that an attorney with JGC had a "frightening experience" when someone rattled the locked door handles to the office when the attorney was working late one evening. He said that "[t]here are many places in the first floor where people can hide, come in from the cold, enter the building, and come into our offices at any time without being checked." Mr. James stated that he believed the building appeared abandoned and indicated that JGC "would not have renewed the lease or expanded the second floor if [JGC] had known the bank was moving out of the building." Mr. James subsequently threatened that 817 would "face serious liability issues" if any employee of JGC was injured because of these security issues and hypothesized that loss of property or injury to a worker in the building "will happen sooner rather than later." Further, Mr. James raised issues with the building's heating and air-conditioning system for the first time.

In the March 12, 2013 email, Mr. James went on to acknowledge that JGC had been behind on its payments every month, attributing these delays to "the slow pay conditions in the insurance defense profession," "the slowdown in the economy," and

4

"extensive storm damage throughout the country." Mr. James admitted that JGC needed to reduce its overhead "[i]n order to survive this economic downturn and the potential for further downturn due to legislative action regarding the legal system in the state of Tennessee." He then stated that JGC "has come to the point where we are not willing to put our safety and safety of our employees at issue or to pay for more space than we can use." Mr. James subsequently offered 817 a deal: "If a termination of the lease is not agreeable to you and the owners, we could continue to stay provided the security issues are taken care of and provided we can agree to a substantial rent reduction." He then referenced a financial analysis done by JGC before stating that "the rent has to be reduced to below $3200 for us to continue our operations at this location." Mr. James went on to surmise that "the building is probably a financial drain on the owners," "the owners are losing money with [JGC] occupying the second floor," and "it is probably in the best interest of all parties concerned [if JGC] can terminate the lease." Thereafter, Mr. James proposed a new rent structure, acknowledged that 817 would be unlikely to accept a rent reduction, reiterated the need for security issues to be addressed, and again threatened 817 with a lawsuit in the event an employee of JGC suffered an injury as a result of lax security. Further, for the first time, he brought up the issue of mold, mentioned problems with the heating and cooling system for the second time, and demanded installation of new thermostats by June 2013. Finally, Mr. James unilaterally concluded that "it is best that all agree to amicably terminate the lease agreement and that [JGC] vacate the building within the next 90 days."

On March 19, 2013, Mr. James sent an email to Mr. Hooks indicating the need to make some decisions quickly. In particular, he stated that JGC would remain as a tenant if there was a rent reduction and the issues that he had previously raised were addressed. Mr. James, however, noted that JGC could not continue to pay its current rent and would need to be released from the lease to move into a cheaper office space because "[t]he survival of [JGC] depends on this issue."

On March 21, 2013, Mr. James sent another email to Mr. Hooks raising several issues. First, he mentioned that "security continues to be a major concern" and referenced a well-known panhandler in the downtown Chattanooga area as evidence of lax security. Second, he reiterated that the first floor vacancy was still an issue for JGC. Third, he discussed issues with the heating and cooling system and the need for updates. Fourth, Mr. James broached the issue of rent once again, highlighting the recent economic downturn affecting insurance companies and stating that "due to these unforeseen circumstances, we can no longer afford the rent and we have to make tough choices including our desire to reduce the rent." Ultimately, he demanded answers by the end of the month regarding his proposal to reduce the rent and potential security measures.

5

On April 1, 2013, Mr. James sent an email to Mr. Hooks noting that the issue of security was "nonnegotiable." In addition, Mr. James reiterated his position that 817 would be liable for "any injury or loss that occurs to any individual occupying or working" in the building and for "any loss to the firm's property." From there, he again discussed the first floor vacancy, the issues with the heating and cooling system, and JGC's need for a reduction in rent.

On April 30, 2013, Mr. James sent an email to Mr. Parks blaming Walldorf for JGC's delinquent rent payments. Similar to his previous emails, Mr. James raised a number of topics. In particular, he (1) conceded that JGC would be unable to make up two months of missing rent payments in the foreseeable future; (2) requested JGC be released from its lease if a rent reduction was not possible; (3) offered to manage the building at 817 Broad Street in lieu of Walldorf; (4) raised the issue of security once again in light of the first floor vacancy; (5) offered to pay for a security system and its monthly maintenance if there was a rent reduction; and (6) concluded by stating that the "situation on security is beyond dire."

On May 9, 2013, Mr. James sent an email to Mr. Parks regarding the issues he had raised in his previous emails. However, Mr. James added that JGC would be dissolving and vacating the building on August 9, 2013. He attributed this decision to "the greatest economic downturn in American history next to the Great Depression . . . the issues facing the building . . . the risk of property loss, personal injury, or the potential loss of life," and the first floor vacancy.

Before JGC could vacate the building, 817 filed a detainer action on July 2, 2013, against the Defendants in the General Sessions Court of Hamilton County. On July 15, 2013, the general sessions court granted a judgment in favor of 817, awarding it possession of the premises and damages in the amount of $30,728.14. On July 25, 2013, the Defendants filed a motion to reconsider and set aside the July 15, 2013 judgment. At an August 12, 2013 hearing, the Defendants' motion to reconsider was denied. Thereafter, on August 20, 2013, the Defendants filed a notice of appeal. The Defendants' notice of appeal did not contain a jury demand.

On November 12, 2013, 817 filed a motion for a scheduling order and to set a trial date. In addition, on November 26, 2013, 817 filed a motion to compel the Defendants to respond to 817's discovery requests, which had previously been served on October 21, 2013. The Defendants replied to both of these motions on December 6, 2013, contending that entry of a scheduling order and the request for discovery responses were both premature in light of a companion action that was pending in the Hamilton County

Chancery Court and the proposed consolidation of that action with this case. On December 11, 2013, the trial court granted 817's motion to set a trial date and noted that there "is no jury demand by either party, so [the trial] will be scheduled on a non-jury day." The trial court subsequently set April 8, 2014, as the trial date for this case. In addition, the trial court issued an order on January 8, 2014, setting January 16, 2014, as the deadline for the Defendants to respond to 817's discovery requests. Despite the clear court order, the Defendants failed to respond by the January 16, 2014 deadline. As a result, 817 filed a motion for contempt and for sanctions on January 22, 2014.

On February 4, 2014, the Defendants filed an answer, demand for a jury trial, counterclaim, and third party complaint against Walldorf, which charged 817 with negligence, gross negligence, common law breach of quiet enjoyment, intentional misrepresentation, negligent misrepresentation, gross misrepresentation, and constructive eviction. That same day, the Defendants also filed a motion to continue to remove the case from the trial court's non-jury calendar, citing the companion action in chancery court and the fact that the third party complaint had demanded a jury trial.

On February 3, 2014, the trial court held a hearing regarding 817's motion for contempt and for sanctions. Thereafter, on February 4, 2014, an order was entered requiring the Defendants to serve responses to 817's discovery requests by 5:00 p.m. that day. On February 6, 2014, 817 filed a third motion to compel and/or for contempt, contending that the Defendants' responses and objections to 817's discovery requests were procedurally invalid, did not comply with the trial court's previous orders, and were ill-founded. On February 17, 2014, the trial court ordered the Defendants to respond to 817's discovery requests in full before February 27, 2014. After the Defendants failed to comply with the February 17, 2014 court order, 817 filed its fourth motion to compel and/or for contempt on February 28, 2014. On March 12, 2014, the Defendants filed another jury demand, which 817 opposed, citing Tenn. R. Civ. P. 38.03.

Following a March 25, 2014 status conference, the trial court issued a memorandum order on April 4, 2014. In that order, the trial court denied the Defendants' demand for a jury after finding that the Defendants had not complied with Tenn. R. Civ. P. 38.03 and had waived their right to a jury. In addition, the trial court imposed sanctions against the Defendants for discovery abuse, awarding 817 attorney's fees for the preparation and filing of its second motion to compel and court appearances related to that motion. The memorandum opinion directed 817 to submit an affidavit detailing the attorney's fees and gave the Defendants seven days to file an objection after the affidavit had been submitted. As directed, 817 submitted an affidavit of fees on April 11, 2014, which documented 4.1 hours of work related to 817's second motion to compel totaling $1,025 in attorney's fees. The Defendants subsequently filed an objection on April 28,

2014, ten days after the seven day deadline to file an objection. The Defendants contended that "too many hours [were] spent for a simple motion" and concluded that "there should not be fees awarded."

On May 1, 2014, 817 filed a fifth motion to compel and/or for contempt, noting that the Defendants had still not adequately responded to discovery requests, which had originally been served on October 21, 2013, and had failed to comply with multiple court orders requiring the Defendants to respond. In addition, on May 29, 2014, 817 filed a motion to compel payment of previously awarded sanctions, as the Defendants had failed to pay in full the monetary sanctions earlier awarded by the trial court. On May 30, 2014, the trial court entered an order, originally submitted to the court on May 13, 2014, that required the Defendants to serve full and complete responses to all of 817's discovery requests by 5:00 p.m. on May 19, 2014. Pursuant to Tenn. R. Civ. P. 68, the Defendants made an offer of judgment on June 23, 2014, proposing $8,177.50 and a subsequent hearing to determine attorney's fees. On June 26, 2014, the trial court entered an order imposing sanctions in the amount of $1,025 and requiring full payment of the sanctions within thirty days.

The parties appeared for a trial before the trial court on July 1 and July 2, 2014. On July 2, 2014, the trial court announced a number of findings of fact and conclusions of law from the bench. First, it determined that the Defendants had waived their constructive eviction claim. Second, the trial court concluded that the Defendants had breached the lease agreement by failing to pay rent in a timely manner, missing rent payments, and moving out before the end of the lease. Third, the trial court stated that JGC's counterclaim was dismissed because JGC was an administratively dissolved corporation. Thereafter, on July 25, 2014, the trial court issued a memorandum opinion and final judgment, which awarded 817 unpaid rent, late fees, and interest under the lease totaling $51,912.18. In addition, the judgment granted 817 attorney's fees and expenses incurred in enforcing the terms of the lease totaling $49,815.47.

The Defendants filed a notice of appeal on August 4, 2014, regarding (1) the April 4, 2014 memorandum order denying the Defendants' demand for a jury and imposing sanctions for discovery abuse; (2) the June 26, 2014 order imposing sanctions against the Defendants for attorney's fees incurred by 817 in the filing of 817's motion to compel; and (3) the July 25, 2014 memorandum opinion and final judgment that awarded 817 unpaid rent, late fees, interest under the lease agreement, attorney's fees, and expenses totaling $101,727.65. On September 11, 2014, the trial court entered an order imposing a $500 sanction for the Defendants failure to pay $1,025 in attorney's fees that was previously awarded to 817. The Defendants subsequently filed an additional notice of appeal on October 2, 2014, regarding the sanction of $500.

8

The following issues are now before us on appeal: (1) whether the trial court erred by denying the Defendants' demands for a jury trial; (2) whether the trial court erred by holding that the Defendants waived the claim for constructive eviction; (3) whether the trial court erred by dismissing the counterclaim of JGC because that firm had already been administratively dissolved; (4) whether the trial court erred by awarding sanctions and determining the amount of sanctions without a factual hearing; and (5) whether the trial court erred by awarding 817 attorney's fees and expenses totaling $49,815.47.

## II.

The trial court's decisions to deny the Defendants' demands for a jury trial directly implicate Tenn. R. App. P. 38.03. In Tennessee, the "[i]nterpretation of the Tennessee Rules of Civil Procedure is a question of law." **Thomas v. Oldfield**, 279 S.W.3d 259, 261 (Tenn. 2009). Our standard of review for questions of law is de novo with no presumption of correctness. **Kinsler v. Berkline, LLC**, 320 S.W.3d 796, 799 (Tenn. 2010) (citing **Blair v. W. Town Mall**, 130 S.W.3d 761, 763 (Tenn. 2004)). Even though our rules of civil procedure are not statutes, "the same rules of statutory construction apply in the interpretation of rules." **Thomas**, 279 S.W.3d at 261 (citing **Crosslin v. Alsup**, 594 S.W.2d 379, 380 (Tenn. 1980)). As a result, we must "ascertain and give effect to the legislative intent without unduly restricting or expanding [the rule's] coverage beyond its intended scope." **Houghton v. Aramark Educ. Res., Inc.**, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting **Owens v. State**, 908 S.W.2d 923, 926 (Tenn. 1995)).

Tenn. R. Civ. P. 38.03 states,

> *In cases removed by appeal or otherwise to the chancery or circuit courts or to courts of similar jurisdiction, any party may demand a trial by jury of any issue triable of right by jury by filing written demand for jury within 10 days after the papers are filed with the clerk.* If such a case is set for trial within 10 days after the papers are filed with the clerk, any party may make demand for jury trial when the case is called for trial. In every case removed to the chancery or circuit courts or to courts of similar jurisdiction the clerk shall promptly give notice to the appellee of the filing of the papers.

9

Tenn. R. Civ. P. 38.03 (emphasis added). In the present case, the Defendants filed their notice of appeal to the circuit court on August 20, 2013. As a result, under Tenn. R. Civ. P. 38.03, the Defendants had ten days to request a jury trial. The Defendants, however, did not raise a jury demand until February 4, 2014, when they filed an answer, jury demand, counterclaim, and third party complaint. Clearly, this jury request fell far beyond the ten day deadline pursuant to Tenn. R. Civ. P. 38.03.

The Defendants contend in their brief that, when viewing their jury demand, we should apply Tenn. R. Civ. P. 38.02, which states,

> Any party may demand a trial by jury of any issue triable of right by jury by demanding the same in any pleading specified in Rule 7.01 or by endorsing the demand upon such pleading when it is filed, or by written demand filed with the clerk, with notice to all parties, within 15 days after the service of the last pleading raising an issue of fact.

Tenn. R. Civ. P. 38.02. As 817 argues in its brief, however, the Defendants are attempting to rely on a broad rule of general applicability to the exclusion of a specific rule that directly addresses the type of case now before us. The explicit wording of Tenn. R. Civ. P. 38.03 makes obvious that this rule is applicable to "cases *removed by appeal or otherwise to the chancery or circuit courts* or to courts of similar jurisdiction." Tenn. R. Civ. P. 38.03 (emphasis added). The present action originated in general sessions court, which entered a judgment that was subsequently appealed to the circuit court. Thus, this case fits squarely within the parameters of Tenn. R. Civ. P. 38.03. Further, "[s]pecific statutory provisions control over conflicting general provisions." ***Arnwine v. Union Cnty. Bd. of Educ.***, 120 S.W.3d 804, 809 (Tenn. 2003); *see also* ***Woodroof v. City of Nashville***, 192 S.W.2d 1013, 1015 (Tenn. 1946) ("[W]here the mind of the legislature has been turned to the details of a subject and they have acted upon it, a statute treating the subject in a general manner should not be considered as intended to affect the more particular provision.") As mentioned earlier, even though our rules of civil procedure are not statutes, "the same rules of statutory construction apply in the interpretation of rules." ***Thomas***, 279 S.W.3d at 261. Thus, we conclude that the trial court correctly relied upon Tenn. R. Civ. P. 38.03 when it dismissed the Defendants' jury demands.

## III.

Whether the Defendants waived their constructive eviction claim is a question of fact. Tenn. R. App. P. 13(d) provides that, "Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of

the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). In Tennessee, "[w]hen a landlord disturbs his tenant's possession, rendering the premises unfit for occupancy for the purposes for which they were demised or depriving the tenants of the beneficial enjoyment of the premises, causing him to abandon them, the tenant has been constructively evicted" so long as the tenant abandons the premises within a reasonable time. *Morrison v. Smith*, 757 S.W.2d 678, 682 (Tenn. Ct. App. 1988) (quoting *Couch v. Hall*, 412 S.W.2d 635, 637 (Tenn. 1967)) (quotation marks omitted). Further, a tenant shall have a reasonable amount of time to exercise the right of abandonment before that right is waived. *Morrison*, 757 S.W.2d at 682.

In the present action, Mr. James testified at trial that, starting in February 2011, JGC was constructively evicted from the office space it rented from 817. As proof of their constructive eviction claim, the Defendants cited FSG's departure from the building, the lack of security in the building after FSG's departure, the building's "appearance of abandonment," issues with the heating and air conditioning system, dirty windows, and trash and homeless people in front of the building. The record reflects that, after FSG's departure, the Defendants raised a number of these issues in a series of emails with 817's representatives from February 2011 through April 2011. At that point, the record contains no further communication until December 2012, when 817's representatives contacted the Defendants about delinquent and consistently late rent payments. Thereafter, in March 2013, the Defendants' issues with the building resurfaced in another series of emails from March 2013 through May 2013. This time, however, these emails also focused on the Defendants' growing financial issues and their desire to reduce their monthly rent.

JGC operated as a functioning law firm in the space it rented for nearly two years after the Defendants first raised their initial concerns in 2011. As a result, one can hardly say that 817 rendered the premises unfit for the operation of a law firm. Moreover, the Defendants did not attempt to locate a different office space until January 2013, coincidentally after they had received notice about delinquent and consistently late rent payments. We find it interesting that the Defendants' issues with the building, which had been tolerated for nearly two years, suddenly constituted a constructive eviction when financial problems arose and 817 did not indulge the Defendants' repeated requests for a rent reduction or amicable split. Ultimately, JGC failed to abandon the premises within a reasonable amount of time, even occupying the office space until August 2013, despite a July 15, 2013 judgment awarding 817 possession of the premises. Thus, the evidence does not preponderate against the trial court's conclusion that the Defendants waived any claim for construction eviction.

11

**IV.**

Whether the trial court erred by dismissing the counterclaim of JGC on the ground that the firm had already been administratively dissolved presents a question of law, which we review de novo with no presumption of correctness. *Kinsler*, 320 S.W.3d at 799. Tenn. Code Ann. § 48-24-202(c) states, "A corporation administratively dissolved continues its corporate existence *but may not carry on any business except that necessary to wind up and liquidate its business and affairs under § 48-24-105 and notify claimants under §§ 48-24-106 and 48-24-107*." Tenn. Code. Ann. § 48-24-202(c) (2012) (emphasis added). In the present action, the record reflects that JGC was administratively dissolved by the State in August 2013, a fact that Mr. James acknowledged in his testimony at trial. JGC's counterclaim, however, was not filed until February 4, 2014, several months after it had already been administratively dissolved. As a result, JGC had no standing to assert a counterclaim against 817 under Tenn. Code Ann. § 48-24-202(c).

The Defendants make two separate arguments in an attempt to counter the clear wording of Tenn. Code Ann. § 48-24-202(c). First, they argue that "an administrative dissolution is a curable defect" and that the court "could, and should, have continued the hearing 30 days to allow JGC to provide proof of reinstatement, rather than pounce upon a technical error of which JGC was unaware as a means to dismiss its claims."[1] This contention is rather perplexing. To start, the Defendants admonish the trial court because the Defendants were apparently unfamiliar with a clear procedural rule. In support of this point, they argue that the trial court elevated form over substance, citing a case where a property owners association was allowed to pursue a lawsuit filed thirteen days before its corporate charter was reinstated. *See Grand Valley Lakes Prop. Owners Ass'n, Inc. v. Cary*, 897 S.W.2d 262, 268-69 (Tenn. Ct. App. 1994). In that case, this Court noted that "reinstatement of the charter validates the corporation's existence and privileges from the date of revocation." *Id.* at 269 (quoting *Loveday v. Cate*, 854 S.W.2d 877, 880 (Tenn. Ct. App. 1992)). This case, however, is quite distinguishable, as the record contains no evidence that JGC ever sought reinstatement of its charter. Had JGC done so, reinstatement of the charter would have retroactively validated JGC's actions dating back to August 2013 when it was administratively dissolved. *Loveday*, 854 S.W.2d at 880. As a result, JGC's failure to seek reinstatement of its charter renders its "form over substance" argument meritless.

---

[1] Despite this argument, the Defendants never requested a continuance so that they could seek to reinstate JGC's corporate charter. Further, the Defendants cite no authority indicating that the trial court was under a duty to grant a continuance, on its own volition, so that the Defendants could cure a defect, about which they apparently had no knowledge.

The Defendants also contend that 817 should have disclosed the fact that it intended to raise the administrative dissolution of JGC as a defense to JGC's counterclaim. On this point, we must agree with 817 that this argument is inconceivable, especially given the fact that the Defendants conducted no written discovery and took no depositions prior to trial. The Defendants failure to conduct discovery precipitated this issue, and it would defy logic to hold 817 accountable here for the clear shortcomings of the Defendants. Thus this argument is without merit, and the trial court was correct in dismissing JGC's counterclaim.

## V.

In Tennessee, appellate courts "review a trial court's decision to impose contempt sanctions using the more relaxed 'abuse of discretion' standard of review." *Freeman v. Freeman*, 147 S.W.3d 234, 242 (Tenn. Ct. App. 2003) (quoting *McDowell v. McDowell*, No. M2000-00164-COA-R3-CV, 2001 WL 459101, at *5 (Tenn. Ct. App. M.S., filed May 2, 2001)). A party "seeking to have a lower court's holding overturned on the basis of abuse of discretion undertakes a heavy burden." *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). In particular, the "abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *Miller v. Miller*, No. E2012-01414-COA-R3-CV, 2013 WL 2382595, at *4 (Tenn. Ct. App. E.S., filed May 30, 2013) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Further, the abuse of discretion standard "does not permit an appellate court to merely substitute its judgment for that of the trial court." *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003) (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). Nevertheless, the abuse of discretion standard does not immunize the discretionary decisions of the trial court from appellate review. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002) (citing *Duncan v. Duncan*, 789 S.W.2d 557, 561 (Tenn. Ct. App. 1990)). Specifically, we will find an abuse of discretion "when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *Miller*, 2013 WL 2382595, at *5. Ultimately, an appellate court will only find an abuse of discretion when "the court that made the decision applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008) (citing *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 131 (Tenn. 2004)).

Pursuant to Tenn. R. Civ. P. 37.02, the trial court had the authority to require the Defendants to "pay the reasonable expenses, including attorney's fees, caused by the

13

failure" to obey an order compelling discovery responses. In this case, 817 originally served its discovery requests on October 21, 2013. After the Defendants failed to respond, 817 filed a motion to compel on November 26, 2013. On January 8, 2014, the trial court entered an order, agreed to by both parties, setting January 16, 2014, as the deadline for the Defendants to respond to discovery requests. Despite agreeing to the January 16, 2014 deadline, the Defendants failed to respond in a timely fashion, prompting 817 to file a motion for contempt and sanctions on January 22, 2014. Thereafter, the trial court entered an order requiring the Defendants to respond to 817's discovery requests by 5:00 p.m. on February 4, 2014. Again, the Defendants failed to comply, as they opted to submit objections in lieu of responses, failed to produce requested documents, and failed to provide complete responses.

The Defendants' noncompliance precipitated a third motion to compel by 817, and the trial court subsequently entered yet another order requiring the Defendants to serve full and complete responses to 817's discovery requests by 5:00 p.m. on February 27, 2014. As before, the Defendants failed to comply, and 817 filed a fourth motion to compel on February 28, 2014, positing that sanctions against the Defendants would be appropriate. In an April 4, 2014 memorandum order, the trial court noted the multiple motions by 817, the repeated noncompliance by the Defendants, and the need to continue the trial as a result of the Defendants' noncompliance. As a result, the trial court imposed sanctions for discovery abuse, awarding 817 attorney's fees for only the preparation and filing of its second motion to compel and its attorney's appearance in court for that individual motion. Despite an order imposing sanctions, the Defendants still failed to respond to 817's discovery requests. Thus, 817 filed a fifth motion to compel and/or for contempt on May 1, 2014, and the trial court entered another order requiring the Defendants to serve full and complete responses to all of 817's discovery requests by 5:00 p.m. on May 19, 2014.

Ultimately, the Defendants habitual noncompliance with clear and unambiguous court orders delayed this matter for several months for no legitimate reason. Further, we find no merit in the Defendants' attempts to blame their repeated failure to respond on 817. In light of these conclusions, we find no abuse of discretion with the trial court's decision to impose contempt sanctions.

## VI.

A trial court's calculation of a "reasonable attorney's fee is a subjective judgment based on evidence and the experience of the trier of facts." *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (quoting *United Med. Corp. of Tenn., Inc. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 137 (Tenn. 1986)) (quotation marks

omitted). In Tennessee, there "is no fixed mathematical rule . . . for determining reasonable fees and costs." ***Killingsworth v. Ted Russell Ford, Inc.***, 104 S.W.3d 530, 534 (Tenn. Ct. App. 2002). As a result, "an appellate court will normally defer to a trial court's award of attorney's fees unless there is a showing of an abuse of the trial court's discretion." ***Id.*** (quoting ***Threadgill v. Threadgill***, 740 S.W.2d 419, 426 (Tenn. Ct. App. 1987)) (quotation marks omitted). Further, when "evaluating the lower court's exercise of its discretion in a non-jury setting, we review its award de novo." ***Killingsworth***, 104 S.W.3d at 534. We must not "disturb the trial court's award unless we find that the evidence preponderates against the trial court's factual findings." ***Id.*** (citing Tenn. R. App. P. 13(d)).

The original lease agreement, signed by both parties on January 9, 2009, contained a specific section regarding attorney's fees and expenses. That clause read as follows:

> In the event that [817] shall be required to engage legal counsel for the enforcement of any of the terms of the Lease, whether such employment shall require institution of suit or other legal services required to secure compliance on the part of Tenant, Tenant shall be responsible for and shall promptly pay to [817] the reasonable value of said attorney's fees, and any other expenses, including without limitation, court costs incurred by [817] as a result of Tenant's default so long as it is adjudicated that the tenant is in default. Any party defaulting any provision of this agreement shall be responsible for attorney's fees and expenses incurred by the non defaulting party, if a party is adjudicated to be in default of a provision of this agreement.

On July 2, 2014, the trial court concluded that the Defendants had defaulted on their lease agreement and instructed 817 to file an affidavit detailing the fees and expenses it sought to claim. 817 subsequently filed an affidavit on July 11, 2014, which included a thorough breakdown from July 2013 through July 2014 detailing the time spent, fees incurred, and costs expended during this litigation. In response, the Defendants filed an objection on July 21, 2014, which stated:

> The Defendants object to the amount of fees requested for many reasons, among which are the unreasonableness of the fees, the fact that much of the work and time was unnecessary, the fact that much of the work that was done would not be covered by the attorney's fees provisions, [the

fact that] some of the fees were on another case, and the fact that the affidavit is insufficient. Moreover, much of the time expended was due to the lack of cooperation on the part of [817's] counsel.

This objection is wholly devoid of any specificity or legal authority that would call into question the reasonableness of the fees and expenses detailed in 817's affidavit. Rather, when given the opportunity to object, the Defendants simply presented a short opinion that questioned the final sum awarded with generalities offered as the sole form of proof.

The Defendants never objected to the trial court's decision to determine attorney's fees by having 817 submit an affidavit and allowing a chance for objections. Further, the Defendants never requested a hearing on the issue of attorney's fees. In Tennessee, "[a]bsent a request for a hearing by the party dissatisfied by the award [of attorney's fees], a trial court is not required to entertain proof as to the reasonableness of the amount of attorney's fees awarded." *Moran v. Willensky*, 339 S.W.3d 651, 664 (Tenn. Ct. App. 2010) (citing *Richards v. Richards*, No. M2003-02449-COA-R3-CV, 2005 WL 396373, at *15 (Tenn. Ct. App. M.S., filed Feb. 17, 2005)). Ultimately, when judging the Defendants' conclusory objection against the thorough affidavit that 817 presented to the trial court, we find no abuse of discretion in the trial court's decision to award 817 attorney's fees totaling $49,815.47.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are assessed to the appellants, James Goins & Carpenter, P.C. and Stuart F. James. The case is remanded to the trial court, pursuant to applicable law, for enforcement of the judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE

16